**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| SUN LIFE ASSURANCE COMPANY OF CANADA, | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | **C.A. No. 3:21-cv-9959** |
| | : | |
| WELLS FARGO BANK, N.A., as Securities Intermediary, | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, Sun Life Assurance Company of Canada ("Sun Life"), by and through its undersigned counsel, hereby files and asserts this Complaint against Defendant, Wells Fargo, National Association, solely in its capacity as Securities Intermediary ("Wells Fargo"), and alleges as follows:

**PARTIES**

1.      Sun Life is a life insurance company organized and existing under the laws of Canada, with its principal place of business in the United States at One Sun Life Executive Park, Wellesley Hills, Massachusetts. Sun Life is a citizen of the Commonwealth of Massachusetts for purposes of diversity jurisdiction.

2.      Wells Fargo is a national banking association organized and existing under federal law with its Articles of Association stating its main office is located at an address in the State of South Dakota. Wells Fargo is a citizen of the State of South Dakota for purposes of diversity jurisdiction.

3.      Wells Fargo is named as a party to this action solely because, as set forth below, in its capacity as Securities Intermediary, it holds bare legal title to the Policy.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity of citizenship between plaintiff Sun Life, a citizen of Massachusetts, and defendant Wells Fargo, a citizen of South Dakota, and there is an actual and ripe controversy between the parties.

6.      Venue is proper in this judicial district under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims occurred in the District of New Jersey.

## FACTUAL BACKGROUND

**A.      Stranger-Originated Life Insurance**

7.      A secondary market for life insurance has emerged, in which existing life insurance policies are sold to third-parties who lack an insurable interest in the lives of the insureds. This type of sale, which is typically referred to as a "life settlement" can, in certain limited circumstances, be lawful, provided that the policy was procured for legitimate purposes and that there was an insurable interest at the inception of the policy.

8.      However, a life settlement is markedly different from an illegal human life wager where persons and/or entities with no relationship with the insured procure a policy on the insured's life. Such arrangements are commonly known as stranger-originated life insurance ("STOLI") transactions. While there are many variations, all STOLI schemes have one objective in common: to give investors with no insurable interest in the life of the insured a financial stake in a life insurance policy on the life of a stranger.

9.      Though the STOLI market is relatively new, the underlying concept is not. For over 100 years, the United States Supreme Court and most states (including New Jersey, the state

whose law controls here) have condemned "wagering policies" as violating public policy because they create a "sinister counter interest" in the early demise of insureds. *Grigsby v. Russell,* 222 U.S. 149 (1911); *Warnock v. Davis,* 104 U.S. 775 (1881); *Trenton Mut. Life & Fire Ins. Co. v. Johnson*, 24 N.J.L. 576 (Sup. Ct. 1854).

10.    Under New Jersey law, a STOLI policy runs afoul of constitutional, statutory, and common law prohibitions against wagering contracts, as well as New Jersey's insurable interest requirement. Specifically, New Jersey's Constitution has prohibited wagering transactions since 1844. *See Nemtin v. Zarin,* 577 F. Supp. 1135, 1137-41 (3d Cir. 1995) (outlining evolution of New Jersey law). The present New Jersey Constitution, adopted in 1947, prohibits "gambling of any kind" unless authorized by a majority of voters at a special election. N.J. Const., Art. IV, Sec. VII, par. 2. Moreover, in 1951, the New Jersey Legislature also enacted statutes defining what constitutes a wagering or a "gaming transaction" and confirmed that such transactions are illegal. *See* N.J. Stat. Ann. § 2A:40-1 (declaring "gaming transactions" defined to include any "wagers . . . upon any lot, chance, casualty or unknown or contingent event" to "be unlawful"); § 2A:40-3 (declaring "gaming transactions" in violation of N.J. Stat. Ann. § 2A:40-1 to be "utterly void and of no effect"). New Jersey's public policy against wagering transactions is also furthered by its insurable interest law. *See* N.J. Stat. Ann. § 17B:24-1.1a.

12.    Although STOLI transactions are often structured in a manner to give the false appearance that a policy is supported by an insurable interest—for example, by having the policy owned by an insurance trust in an insured's name with a family member initially named as a beneficiary—courts applying New Jersey law look beyond the mere form of the transaction and scrutinize the substance of the transaction to determine whether a policy is an illegal STOLI transaction.

13.    In *Sun Life Assur. Co. of Can. v. Wells Fargo, N.A. ("Bergman")*, 238 N.J. 157 (2019), the New Jersey Supreme Court held that "STOLI policies are against public policy and are void *ab initio*, that, is from the beginning."  In this regard, the Supreme Court in *Bergman* held, among other things, that "a life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured does violate the public policy of New Jersey, and such a policy is void at the outset."  As the New Jersey Supreme Court explained, (i) "STOLIs commonly involve life insurance policies procured and financed by investors—strangers—who have no insurable interest in the life of the insured yet, from the outset, are the ultimate intended beneficiaries of the policy"; (ii) "[g]enerally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value"; (iii) in a STOLI arrangement, "[i]t is also common for an insured to buy the policy in the name of a trust and name a 'spouse or other loved one as the trust beneficiary'"; and (iv) "[i]f a third party without an insurable interest procures or causes an insurance policy to be procured in a way that feigns compliance with the insurable interest requirement, the policy is a cover for a wager on the life of another and violates New Jersey's public policy."

     **B.**    **The Application for a $9 Million Life Insurance Policy**

15.    As early as June 2007, Sun Life began receiving inquiries regarding a potential $9 million life insurance policy on the life of Tova Fruchter.

16.    In or around July 2007, Sun Life received an Application for life insurance (the "Application") insuring the life of Ms. Fruchter.  A copy of the Application is attached as Exhibit "A."  (Appropriate redactions of personal information have been made.)

17.    The Application sought a $9 million life insurance policy, naming the Fruchter One Trust (the "Trust") as the "owner" and "beneficiary," with Eli Fruchter as the trustee of the Trust. The Application identified the Trust as a New Jersey trust.

18.    The Application was signed on July 16, 2007 in Lakewood, New Jersey by Ms. Fruchter as the Insured, by Eli Fruchter as the trustee of the Trust as the Policy Owner, and by Alter Rubin as the Registered Representative.

19.    The Application represented that the proposed insurance would be used for Ms. Fruchter's "Estate Plan" and that the Trust would be paying the premiums.

20.    The Application represented that Ms. Fruchter's "Total Household Income" was $1.2 million and that she had a "Total Household Net Worth" of $25 Million.

21.    In signing the Application, each of the signatories represented, among other things, that (i) the "information provided in the Application . . . is the basis for and becomes part of the Insurance contract issued as a result of the Application"; (ii) I/we declare that the statements and answers in this Application are complete and true to the best of my/our knowledge and believe that they are correctly recorded; and (iii) "I/we understand that any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance or statement of claims containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects that person to criminal and civil penalties."

22.    Thus, in completing the Application, the signatories knew that they were required to provide truthful, accurate, and honest responses to the questions presented.  Furthermore, they knew that Sun Life would rely upon the statements recorded on the Application in determining whether to issue a policy with the face amount requested, or whether to issue a policy at all.

23.     In support of the Application, a Personal Financial Questionnaire, signed by the insured, was also submitted to Sun Life and represented, among other things, that the insured had a $27,420,0000 net worth, which included (i) $31,420,000 in assets (including $4,590,000 in cash/savings, $9,730,000 in stocks/bonds, $450,000 in personal property and $16,650,000 in real estate); and (ii) $4 million in liabilities.  It was also represented that the insured's accountant was an individual named Jack Friedman.

24.     In further support of  the Application, a financial statement was submitted to Sun Life under letterhead, purportedly prepared by an accountant named Jack Friedman at the address of 184 Colony Circle, Lakewood, New Jersey 08701.  The financial statement represented, among other things, that the insured had a net worth in excess of $27 million.

25.     In further support of the Application, a Life Insurance Source of Premium Eligibility Worksheet, signed by the producer, Alter Rubin, was submitted to Sun Life and represented, among other things, that (i) the source of the premiums was the Trust; (ii) no financing was being used to fund the premiums; and (iii) there had been no "discussion about selling the proposed life insurance policy, trust or limited liability company that will own this or any other life insurance policy to a life settlement company or group of investors within the next five years."

**C.     The Issuance of the Fruchter Policy**

26.     In reliance upon the aforementioned representations contained in the Application and other supporting documents and information submitted to Sun Life in connection with the Application, Sun Life issued a policy with a $9 million death benefit (policy number 020150051) (the "Policy") with an issue date of September 12, 2007 insuring the life of Ms. Fruchter with the Trust as owner and beneficiary.

27.     On September 10, 2007, the trustee of the Trust signed a delivery receipt acknowledging and representing that the Policy was delivered to the Trust in Lakewood, New Jersey.

D.      **The Human Life Wager and Materially False Representations**

28.     Upon information and belief, the initial premiums paid for the Policy were not funded by the insured or any other person with an insurable interest in the Ms. Fruchter's life and, instead, the premiums were funded by persons and/or entities that lacked an insurable interest in Ms. Fruchter's life and were participating in a wager on her life so that they might profit.

29.     Upon information and belief, in furtherance of this human life wager, the Application and other documents (described above) in support of the Application contained materially false information which was intended to induce, and which did induce, Sun Life to issue the Policy.

30.      Upon information and belief, there were materially false representations made regarding, among other things, (i) the insured having an estate planning need for the Policy; (ii) the insured's assets, net worth and income; (iii) an individual named Jack Friedman being the insured's accountant; (iv) the Trust being the payor and source of the premiums; and (v) the lack of any discussions about selling the Policy to a life settlement company and/or investors.

31.     Sun Life relied upon the accuracy of the information provided in the aforementioned Application and supporting documents and never would have issued the Policy had it known the truth.

E.      **The Transfers of Policy Ownership/Beneficiaries**

32.     On July 15, 2010, the Trust changed the owner and beneficiary of the Policy to Dukes Bridge LLC ("Dukes Bridge").

33.    On December 29, 2010, Dukes Bridge changed the owner and beneficiary of the Policy to Manufacturers and Traders Trust Company ("Manufacturers"), as securities intermediary.

34.    On March 15, 2012, Manufacturers changed the owner and beneficiary of the Policy to Wells Fargo, as securities intermediary.

35.    On May 21, 2014, Wells Fargo changed the owner and beneficiary of the Policy to Wilmington Trust, N.A. ("Wilmington Trust"), as securities intermediary.

36.    On October 31, 2018, Wilmington Trust changed the owner and beneficiary of the Policy to Wells Fargo, as securities intermediary, which is the current record owner and beneficiary.

**F.    The Death Claim**

37.    On January 16, 2021, the insured died.

38.    Thereafter, Sun Life received a claim for the payment of the death benefit.

## COUNT I

## DECLARATORY JUDGMENT—ILLEGAL HUMAN LIFE WAGERING CONTRACT

39.    Sun Life hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

40.    The Policy, which was applied for, issued, and delivered to the Trust in New Jersey, is governed by New Jersey law.

41.    As set forth above, New Jersey has constitutional, statutory, and common law prohibitions against human life wagers, and the New Jersey Supreme Court in *Bergman* ruled that STOLI transactions are illegal and void *ab initio* under New Jersey law.

42.    Upon information and belief, the Policy was, from the outset, intended as a wager on the life of Ms. Fruchter and stranger investors were wagering on Ms. Fruchter's life and hoping

to cash in on the Policy by either selling the Policy for a profit on the secondary market or collecting the death benefit upon the insured's death.

43.     Upon information and belief, the Policy is an illegal human life wager under New Jersey law because the Policy was taken out with the intent to benefit stranger investors lacking an insurable interest in the insured's life and stranger investors procured the Policy and funded the initial premiums on the Policy.  *See Bergman*, 238 N.J. 157 (New Jersey Supreme Court holding that "a life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured does violate the public policy of New Jersey, and such a policy is void at the outset.") (As New Jersey Supreme Court explained, (i) "STOLIs commonly involve life insurance policies procured and financed by investors—strangers—who have no insurable interest in the life of the insured yet, from the outset, are the ultimate intended beneficiaries of the policy"; and (ii) "[g]enerally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value").

44.     Accordingly, Sun Life seeks, and is entitled to, a declaratory judgment declaring whether the Policy is an illegal and void *ab initio* human life wager under New Jersey law.

## COUNT II

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

45.     Sun Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

46.     Upon information and belief, although the Policy transaction was structured to attempt to feign technical compliance with New Jersey's insurable interest statute, N.J. Stat. Ann. § 17B:24-1.1a, by establishing the Trust in the insured's name as the initial Policy owner, the Policy lacks an insurable interest and is void *ab initio* because the Policy was taken out with the

intent to benefit stranger investors lacking an insurable interest in the insured's life and stranger investors procured the Policy and funded the initial premiums on the Policy. *See Bergman*, 238 N.J. 157 (New Jersey Supreme Court holding that "a life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured does violate the public policy of New Jersey, and such a policy is void at the outset.") (As New Jersey Supreme Court explained, (i) "STOLIs commonly involve life insurance policies procured and financed by investors—strangers—who have no insurable interest in the life of the insured yet, from the outset, are the ultimate intended beneficiaries of the policy"; (ii) "[g]enerally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value"; (iii) in a STOLI arrangement, "[i]t is also common for an insured to buy the policy in the name of a trust and name a 'spouse or other loved one as the trust beneficiary'"; and (iv) "[i]f a third party without an insurable interest procures or causes to an insurance policy to be procured in a way that feigns compliance with the insurable interest requirement, the policy is a cover for a wager on the life of another and violates New Jersey's public policy.").

45.     Accordingly, Sun Life seeks, and is entitled to, a declaratory judgment declaring whether the Policy lacks an insurable interest and is void *ab initio* under New Jersey law.

## PRAYER FOR RELIEF

WHEREFORE, Sun Life respectfully requests the entry of an Order by this Court as follows:

A.     Declaring whether the Policy is void *ab initio*;

B.     Declaring whether, because the Policy is void *ab initio,* the Court will leave the parties to this illegal contract as it finds them, thus permitting Sun Life to retain the premiums paid

on the Policy or, in the alternative, declaring that Sun Life may retain some or all of the premiums

paid on the Policy;

     C.     Awarding Sun Life's attorneys' fees and costs associated with seeking this

judgment, as determined by the Court; and

     D.     Awarding Sun Life such further relief as this Court deems appropriate.

Dated: April 21, 2021          COZEN O'CONNOR, P.C.

          */s/ Charles J. Vinicombe*
          Charles J. Vinicombe (006401990)
          Suite 300 Liberty View
          457 Haddonfield Rd.
          P.O. Box 5459
          Cherry Hill, NJ 08002
          (856) 910-5003
          cvinicombe@cozen.com

          *Attorneys for Plaintiff Sun Life Assurance Company of Canada*